Leland S. Collins and Serelda W. Collins v. Commissioner.
Collins v. Commissioner
Docket No. 93181.
United States Tax Court
T.C. Memo 1963-285; 1963 Tax Ct. Memo LEXIS 60; 22 T.C.M. (CCH) 1467; T.C.M. (RIA) 63285; October 17, 1963
John K. Lynch, 907 East Ohio Bldg., Cleveland, Ohio, for the petitioners. John F. Papsidero for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1959 in the amount of $5,844.68. The issue for decision is whether petitioner Leland S. Collins received taxable income in the amount of $15,000 in the year 1959 when his note to the Roth Steel Tube Company in that face amount, dated October 21, 1957, was returned to him. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife now residing in Venice, Florida, filed a joint income tax return, on the cash basis, for the calendar year 1959 with the district director of internal revenue at Pittsburgh, Pennsylvania. *61 In 1953, Leland S. Collins (hereinafter referred to as petitioner) accepted a position as general manager of Jamestown Manufacturing Company (hereinafter referred to as Jamestown), a manufacturer of playground equipment with headequarters at Jamestown, Pennsylvania. During the course of his employment petitioner became president of Jamestown, and at the time of his retirement in 1959, was chairman of the board of directors. Jamestown purchased steel products from Roth Steel Tube Company of Cleveland, Ohio (hereinafter referred to as Roth Steel). Jamestown's purchases from Roth Steel amounted to approximately $1,000,000 per year. Roth Steel was a corporation wholly owned by Irving Roth and his son, Leonard Roth. On October 18, 1957, petitioner received Roth Steel's check No. 424 in the amount of $15,000. A day or two prior to October 18, 1957, petitioner, while having lunch with Irving Roth at a restaurant in Cleveland, Ohio, told Roth his physical condition was such that he would like to retire but did not know whether he was financially able to do so. Roth said to petitioner that he might be able to help him and when petitioner inquired what sort of help, Roth said he believed *62 he could let him have $15,000, that he would let him know. On October 18, 1957, Irving Roth handed Roth Steel's check to petitioner. Subsequent to receiving the check, petitioner was advised over the telephone that Roth should have something to show his bookkeeper. Petitioner said that he would prepare a note and attach as security a certificate for 10,000 shares of stock of Consolidated Mines, Inc., a Philippine Islands corporation. Both petitioner and Roth were aware of the value of this stock which was 3 cents per share in October 1957. In return for the Roth Steel check No. 424, petitioner executed and handed to Irving Roth the following note: $15,000.00 Greenville, Pennsylvania, October 21, 1957 TWO YEARS AFTER DATE THE UNDERSIGNED PROMISES TO PAY TO THE ORDER OF Roth Steel Tube Company Fifteen Thousand and No/100 DOLLARS AT FARMERS AND MERCHANTS TRUST COMPANY, GREENVILLE, PENNSYLVANIA for value received, * with interest from date at the rate of 5 per cent per annum, payable annually, having pledged and deposited herewith as collateral security for payment of this liability to the holder hereof, and hereby creating in favor of the payee and any subsequent holder hereof a security *63 interest in the following stock; hereinafter called the "collateral": (Certificate # 6796 A For 10,000 shares of stock of Consolidated Mines, Inc., herewith). This note shall be and become immediately due and payable, at the option of the holder, without any demand or notice whatsoever, forthwith (1) upon the nonperformance or nonobservance of any promise or covenant herein with full power and authority to the holder to proceed to exercise the rights accorded by law, including the right without limitation to sell and assign and deliver the whole of the collateral or any part thereof without demand or any notice to the undersigned or any other person except as required by law, and with the right in the holder to purchase as any other person at any such sale to the extent provided by law, free from any right of redemption by the undersigned. Anything to the contrary in the foregoing not withstanding, all liability of the undersigned maker for payment of principal hereof or interest hereon is strictly limited to this collateral and in the event of default hereunder by the maker and the acquisition of this collateral by the holder hereof there shall be no deficiency liability of the maker *64 in the event the value of this collateral is less than any remaining obligation of maker hereunder. Address: 263 East Ave., Greenville, Pa.
/s/ L. S. Collins. * Roth Steel Check # 424 - Dated October 18, 1957. Under date of October 18, 1957, Roth Steel made a book entry in its records of a credit to cash and a debit to loans receivable from Irving Roth. Petitioner was never an employee, officer, director, or stockholder of Roth Steel. In January of 1959 petitioner resigned from Jamestown effective February 1, 1959. On January 3, 1959, the note dated October 21, 1957, to Roth Steel, executed by petitioner, together with the security certificate, were returned to petitioner by Irving Roth then president of Roth Steel. In January 1959 a share of stock of Consolidated Mines Inc., had a value of 1 cent. Petitioner had made no payments on the note to Roth Steel although able to do so. At the time the note was returned, Roth Steel made a book entry debiting travel expenses and crediting loans receivable from Irving Roth. On its 1959 income tax return Roth Steel claimed a deduction for $15,000 travel expenses due to the crediting of petitioner's loan and the debiting of an amount *65 due to travel expenses. As a result of an investigation of the 1959 income tax return filed by Roth Steel, respondent mailed, on June 27, 1960, a letter setting forth the proposed adjustments to be made to its 1959 reported income. Roth Steel, by its president, Irving Roth, submitted a protest dated July 6, 1960, which was received by the district director of internal revenue on July 12, 1960, wherein Roth Steel protested the proposed disallowance of the $15,000 travel expense deduction. On September 28, 1960, Roth Steel, by Irving Roth, its president, filed an agreement to the disallowance of the $15,000 deduction claimed for traveling expenses and paid the additional tax resulting from the adjustments. On March 25, 1961, Irving Roth died. Irving Roth and petitioner during the years 1956 through 1959 were personal friends as well as business associates. Petitioner dealt principally with the vice president and general manager of Roth Steel in his purchases for Jamestown from Roth Steel but also dealt with Irving Roth in this respect. All transactions by petitioner for Jamestown with Roth Steel were at arm's length. It was not petitioner's understanding when he received the check *66 for $15,000 or when he executed the note to Roth Steel that it was expected that he would repay the $15,000. Petitioners on their 1959 income tax return under Schedule H. - Other income, showed after item three, Other sources (state nature), "$15,000 Non-Taxable Gift." Petitioners in their protest which was sworn and subscribed to before a notary public stated, among other things, "In October, 1957 at a time when Mr. Collins was contemplating retirement because of bad health, Mr. Roth of Roth Steel, because of friendship and trust in Collins, loaned him $15,000.00." Respondent in his notice of deficiency increased petitioners' income as reported by the amount of $15,000 with the following explanation: In your income tax return for the taxable year ended December 31, 1959 you listed the receipt of $15,000.00 from Roth Steel Tube Company as a nontaxable item. It is held that such funds were compensatory in nature and includable as ordinary income within the meaning of Section 61 of the Internal Revenue Code of 1954. Accordingly, your income is increased by that amount. Petitioner in his petition filed July 3, 1961, alleged in paragraph 5(a) as follows: *67 In October, 1957 the petitioner, Leland Collins, borrowed $15,000.00 at which time he executed a note payable to the lender, accompanied by collateral for the loan. In an amendment to petition filed at the trial, petitioner amended his petition by substituting as paragraph 5(a) the following: In October, 1957, the petitioner, Leland S. Collins, was given $15,000.00 by Roth Steel Tube Company of Cleveland, Ohio, at which time petitioner executed a note payable to Roth Steel accompanied by 10,000 shares of Consolidated Mines, Inc., a Philippine corporation, as collateral. Respondent in his answer to the original petition denied the allegations of paragraph 5(a) and in his answer to amendment to petition admitted the execution of the note and denied the remaining allegations of paragraph 5(a) of the amendment to petition. Opinion It is petitioner's position that the $15,000 was a gift to him in October 1957 from Roth Steel, that there was no indebtedness of petitioner to Roth Steel in January 1959 and, therefore, the return of the note with the collateral attached did not represent cancellation of indebtedness or otherwise represent income to him. Petitioner further contends *68 that if in fact the note represented any indebtedness, the indebtedness which it represented was limited to the value of the collateral attached to the note by the terms of the note, itself, which value was not in excess of $100 in January 1959, and that therefore if the return of the note constituted cancellation of indebtedness, the income which he received was not in excess of $100. It is respondent's position that petitioner in 1959 realized income in the amount of $15,000 upon the cancellation of indebtedness owed to Roth Steel, and that this amount constituted ordinary income includable in petitioner's taxable income for the year 1959. Respondent contends that in October 1957 petitioner borrowed $15,000 from Roth Steel and was indebted to Roth Steel for this amount until January 1959 when the indebtedness was cancelled. Respondent contends that the evidence introduced at the trial fails to show that Roth Steel made a gift to petitioner in October 1957 of $15,000 in that there is no showing of an intent on the part of Roth Steel to make such a gift. In Commissioner v. Duberstein, 363 U.S. 278 (1960), the Supreme Court made it clear that the term "gift" as used *69 in the statute providing for an exclusion from gross income of property so received was not used in the common law sense of a voluntary transfer by one person to another without consideration or compensation therefor. The Court then stated: * * * A gift in the statutory sense, * * * proceeds from a "detached and disinterested generosity," Commissioner v. LoBue, 351 U.S. 243, 246; "out of affection, respect, admiration, charity or like impulses." Robertson v. United States, supra, at 714 [343 U.S. 711]. And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's "intention." Bogardus v. Commissioner, 302 U.S. 34, 43. "What controls is the intention with which payment, however voluntary has been made." * * * Petitioner in the instant case has produced no evidence to show that the payment to him of $15,000 in 1957 by Roth Steel proceeded from a detached and disinterested generosity. All that the evidence in the record shows with respect to the intention of Roth Steel is how the transaction here involved was handled on the books of that corporation. This meager evidence is more indicative *70 of a transaction with an underlying business motive than of a payment from detached and disinterested generosity. Although petitioner does not argue that the gift to him was from Irving Roth, individually, as distinguished from Roth Steel, petitioner's testimony in certain respects suggests that this was his view of the transaction. [1] The difficulty with this possibility is that the method of handling the item on the books of Roth Steel does not support an intention on the part of Irving Roth, personally, to make a gift to petitioner. While the loan as charged on the corporate books was to Irving Roth, the transaction charging a satisfaction of the loan on the books of Roth Steel was a charge to traveling expense and not to the drawing account of Irving Roth. Irving Roth died prior to the date of the trial of this case, and the only evidence of his intention is petitioner's understanding or belief. Since Irving Roth was president, and he and his son the sole stockholders of Roth Steel, we infer that he directed the method of handling the transaction here involved on the books of Roth Steel. The fact that Irving Roth had the transaction handled as it was on the records of Roth Steel *71 is evidence that he did not intend a gift to petitioner. The burden is, of course, on petitioner to establish that the $15,000 was a gift to him. Max Kralstein, 38 T.C. 810, 818-819 (1960). Petitioner has failed to carry this burden. *72 Petitioner makes the alternative argument in his brief that even if the theory is followed that there was a loan to petitioner and a forgiveness of indebtedness on January 3, 1959, the income is limited to the nominal value of the collateral returned to him. Petitioner points out that he was not personally liable on the note and that the value of the collateral from which the note was payable was only $100 in January 1959. Petitioner states that not only his testimony that he made no agreement in 1957, aside from the note, to repay the $15,000 but the other evidence of record supports his position that at no time in 1959 did he have personal liability for an indebtedness to Roth Steel or Irving Roth. Respondent's only answer to this argument is the following paragraph in his reply brief: The transaction in October of 1957 was a loan to petitioner in the amount of $15,000 which petitioner promised to repay in October of 1959. Petitioner's reliance on brief of the terms and value of the note is moot since the note was returned together with the collateral security in January of 1959, long before the due date set in the note and before petitioner became liable to repay the loan. *73 From this statement respondent apparently recognizes that petitioner's indebtedness to Roth Steel was only as evidenced by the note of October 21, 1957, since he says that as of January 1959 petitioner had not become "liable to repay the loan." In any event, we think the evidence establishes that other than the intention evidenced by the note, itself, there was no understanding by Roth Steel, Irving Roth, or petitioner that any portion of the $15,000 paid to petitioner in 1957 would be repaid to Roth Steel or Irving Roth by petitioner. That Roth Steel on its books charged the amount as a loan to Irving Roth and that the note given by petitioner to Roth Steel was collectible solely from the collateral which both petitioner and Irving Roth knew to be worth only about $300, are facts strongly supporting petitioner's testimony that he was never personally obligated to repay to anyone the $15,000 paid to him in 1957 by Roth Steel. In reaching the conclusion that the only indebtedness from petitioner to Roth Steel of Irving Roth resulting from the 1957 transaction was that created by petitioner's note to Roth Steel, we have not overlooked the fact that in his sworn protest petitioner *74 referred to a loan to him in 1957 by Irving Roth and in his original petition filed in this Court referred to borrowing $15,000 and executing a note payable to the lender. We, nevertheless, find that the evidence as a whole shows that the 1957 transaction resulted in no indebtedness of petitioner to Roth Steel or Irving Roth except that occasioned by petitioner's note given to Roth Steel in 1957. The indebtedness on this note was limited as to collectibility to the collateral given and therefore did not create a personal debt from petitioner to Roth Steel. For this reason the return of the note to petitioner in 1959 did not result in the cancellation of any personal indebtedness of petitioner. The return of the collateral did result in freeing that collateral for petitioner's use as he saw fit. If a note representing a valid personal indebtedness of a solvent taxpayer is returned and the debt represented thereby cancelled under circumstances resulting in income to that taxpayer, the amount of income is measured by the indebtedness released irrespective of the value of the note. It is the cancellation of the indebtedness, thus freeing the taxpayer's assets to the extent of the cancellation, *75 which results in the income to the taxpayer whether or not the indebtedness is evidenced by a note. See Harry L. Bialock, 35 T.C. 649, 660-662 (1961). The return of a note which represents no personal liability of a taxpayer does not free any assets except those from which the note might otherwise have been paid. Since the underlying theory of income from cancellation of indebtedness is the freeing of the debtor's assets from liability for the debt, any such income is limited to the amount of assets freed by the cancellation. See Hotel Astoria, Inc., 42 B.T.A. 759, 763-764 (1940). The evidence here is clear that the value of petitioner's assets freed by the return to him of his note and collateral in 1959 was $100. We, therefore, hold that petitioner in 1959 received income from the transaction here involved of only $100. Since the only year before us is 1959, it is unnecessary for us to consider the effect of the transaction on petitioner's taxable income for the year 1957. Decision will be entered under Rule 50. Footnotes
1. Petitioner's testimony was as follows: Q. Proceed, Mr. Collins. A. I was at the point where Irv said he might help me. I asked him, "What way?" And he said, "Well, I believe that I can let you have about $15,000." And I said, "Well, how Irv?" I was elated. He said, "Well, I will let you know." I will look into my affairs and see what can be done, and that he did. He gave me a check, subsequently. I believe it was - Q. It has been stipulated that on October 18, you were given a check for $15,000 by Roth Steel Corporation, Check No. 424, and was given to you by Irving Roth. A. Yes, it was. Q. Now, Mr. Collins, when that check was given to you, what was your interpretation of the transaction? What did you believe at that time? A. It was an outright gift, no obligation for me to do anything for it, and he had no obligation to give it to me other than our friendship. Q. Well, did you at that time believe you had an obligation to repay the $15,000? A. Never had, never. * * *
Q. Why should Irving Roth give you $15,000; was it just out of friendship? A. Because he was a very wealthy man and I was a little fellow and we had been very good friends. I would do the same thing. * * *Q. Do you recall when you gave that note to Mr. Roth? A. It was right around the 21st. It might have been the 22nd, I don't recall. Q. That would be a few days after you were given that check? A. Yes. Not at the time of the check. Q. Now, what was the reason that you gave the note? A. Subsequent to receiving the check, I was advised over the telephone that Mr. Roth should have something to show his bookkeeper. Now, those are the exact words I remember, and I said that I would prepare a note, and I suggested that we attach the securities, which we both knew about, as being a very nominal value.↩